# IN THE UNITED STATES DISTRICT COURT

## FOR THE DISTRICT OF PUERTO RICO

**ENRIQUE CEBALLOS-GERMOSÉN, et al.**

**Plaintiffs**

**v.**

**DOCTOR'S HOSPITAL CENTER MANATI, et al.**

**Defendants.**

**CASE NO. 14-1217 (GAG)**

## OPINION AND ORDER

Enrique Ceballos ("Ceballos"), Fremia Ceballos-Germosén ("Fremia") and Maysa Ceballos-Germosén ("Maysa") (collectively "Plaintiffs") filed the instant action seeking compensation for the damages suffered from the wrongful death of Doctor Fremia Germosén-Canela ("Germosén"), their mother, against Doctor's Center Manatí ("Doctor's Center") and Germosén's treating physicians (collectively "Defendants") under the Emergency Medical Treatment and Active Labor Act ("EMTALA"), 42 U.S.C. § 1395 dd. (Docket No. 1.) Plaintiffs also assert a medical malpractice claim, invoking the court's diversity jurisdiction pursuant to Puerto Rico's general tort statutes, Article 1802 and 1803 of the Puerto Rico Civil Code, P.R. Laws Ann. tit., §§ 5141-5142. Id.

Pending before the court is Doctor's Center's Motion for Partial Summary Judgment seeking dismissal of Plaintiffs' EMTALA claims for lack of subject matter jurisdiction pursuant

Civil No. 14-1217 (GAG)

to Rule 56 of the Federal Rules of Civil Procedure.[1]  (Docket No. 25.)  Namely, Doctor's Center contends that Plaintiffs' EMTALA claim fails as a matter of law and therefore the claim should be dismissed.  Id. ¶ 4.

After carefully reviewing the parties' submissions and pertinent law, Doctor's Center's Motion for Partial Summary Judgment is **GRANTED**.  Furthermore the court, *sua sponte,* notes that the Plaintiffs lack complete diversity, therefore the court lacks subject matter jurisdiction over their state law claims.  Accordingly, Plaintiffs' state law claims are **DISMISSED**.

## I.      Standard of Review

Summary judgment is appropriate when "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law."  Celotex Corp. v. Catrett, 477 U.S. 317, 322 (1986); see FED. R. CIV. P. 56(a).  "An issue is genuine if 'it may reasonably be resolved in favor of either party' at trial, . . . and material if it 'possess[es] the capacity to sway the outcome of the litigation under the applicable law.'"  Iverson v. City of Boston, 452 F.3d 94, 98 (1st Cir. 2006) (alteration in original) (internal citations omitted).  The moving party bears the initial burden of demonstrating the lack of evidence to support the non-moving party's case.  Celotex, 477 U.S. at 325.  "The movant must aver an absence of evidence to support the nonmoving party's case.  The burden then shifts to the nonmovant to establish the existence of at least one fact issue which is both genuine and material."  Maldonado-Denis v. Castillo-Rodríguez, 23 F.3d 576, 581 (1st Cir. 1994).  The nonmovant may establish a fact is genuinely in dispute by citing particular evidence in the record

---

[1] Originally, Doctor's Center moved the court to dismiss Plaintiffs' claims for lack of subject matter jurisdiction under Rule 12(b)(1) of the Federal Rules of Civil Procedure.  The court ordered that it would be treating Defendant's motion as a Rule 56 Motion for Summary Judgment and thus ordered Plaintiffs' to oppose it accordingly.  (See Docket No. 27.)

Civil No. 14-1217 (GAG)

or showing that either the materials cited by the movant "do not establish the absence or presence of a genuine dispute, or that an adverse party cannot produce admissible evidence to support the fact." FED. R. CIV. P. 56(c)(1)(B).  If the court finds that some genuine factual issue remains, the resolution of which could affect the outcome of the case, then the court must deny summary judgment.  See Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986).

When considering a motion for summary judgment, the court must view the evidence in the light most favorable to the non-moving party and give that party the benefit of any and all reasonable inferences.  Id. at 255.  Moreover, at the summary judgment stage, the court does not make credibility determinations or weigh the evidence.  Id.  Summary judgment may be appropriate, however, if the non-moving party's case rests merely upon "conclusory allegations, improbable inferences, and unsupported speculation." Forestier Fradera v. Mun. of Mayaguez, 440 F.3d 17, 21 (1st Cir. 2006) (quoting Benoit v. Technical Mfg. Corp., 331 F.3d 166, 173 (1st Cir. 2003)).

## II.        Relevant Factual and Procedural Background

During the month of March 2013, Germosén, an eighty-two (82) year old retired gynecologist/obstetrician, underwent hip surgery at HIMA Hospital after suffering a hip fracture on her right hip.  (Docket No. 1 ¶ 17.)  Thereafter, Germosén was transferred to Health South Hospital ("Health South") for rehabilitation care.  (Docket Nos. 1 ¶ 17; 25 at 8.)  Upon their arrival at Health South, Fremia and Maysa informed the nurses of their mother's condition and constipation.  (Docket No. 1 ¶ 18.)  At Health South, Defendant Dr. José De León Collazo ("Dr. De León") arrived at Germosén's hospital room and introduced himself to Germosén and her daughters as an internal medicine doctor.  Id. ¶ 19.  Dr. De León then performed a brief physical examination on Germosén.  Id.

Civil No. 14-1217 (GAG)

On March 18, 2013, Germosén woke up complaining and feeling nauseous. (Docket No. 1 ¶ 20.) She vomited a dark substance that was later identified as blood. Id. Consequently, Dr. De León diagnosed her with active upper gastrointestinal bleeding and ordered the patient be transferred to Doctor's Center. (Docket No. 1 ¶ 21.) Dr. De León did not inform Germosén's daughters of their mother's medical condition. Id. Health South and Doctor's Center are contiguous facilities that connect through a walkway. Id. ¶ 22. Doctor's Center is a "participating hospital" as defined by EMTALA. (See 42 U.S.C. § 1395 dd (e)(3)(A).)

At approximately 6:28 a.m., Germosén arrived at the Doctor's Center Emergency Room. (Docket No. 1 ¶ 22.) During her transfer, Germosén continued vomiting blood. Id. ¶ 23. At 6:30 a.m. Defendant Doctor Ricardo Piñero ("Dr. Piñero") inserted a nasogastric tube into Germosén's nose. Id. ¶ 26. Dr. Piñero failed to speak to or notify Germosén, or her daughter Fremia, of the status of her condition. Id. ¶ 26. Germosén was transferred to a room with glass windows. Id. On or about 7:40 a.m., Fremia approached the clerk's desk requesting to speak to Dr. De León and the clerk told her that they were expecting him soon. Id. ¶ 29. At 8:08 a.m. two nurses took blood samples from Germosén and administered medication. Id. During the time Germosén was waiting at the emergency room she continued coughing blood. Id.

Plaintiffs and Defendant dispute as to the exact time when Germosén was admitted to the hospital as an inpatient. According to Plaintiffs, Germosén was admitted as an inpatient at 12:55 p.m., and directly transferred to the Intensive Care Unit ("ICU"). (Docket Nos. 1 ¶ 47; 31-2 at 2.) Until that time, Plaintiffs contend, Germosén had not been admitted to the hospital as an inpatient, instead she was being treated as an emergency room patient. Id.

Conversely, Doctor's Center argues that Germosén was admitted to the hospital at 7:50 a.m. as an inpatient shortly after her arrival and initial evaluation at the Emergency Room.

4

Civil No. 14-1217 (GAG)

(Docket No. 25 at 9.)  Doctor's Center set forth Germosén's medical records.  Id.  By virtue of the medical records provided, Doctor's Center evinces that Germosén was admitted to the hospital as an inpatient by Dr. Piñero, under Dr. De León's orders and his service.  (Docket Nos. 25 at 9; 25-4.)  The medical records submitted as evidence show that the admission order was placed at 7:50 a.m.  (Docket No. 25-4.)  Then, due to her condition, Dr. De León transferred Germosén to the ICU.  (Docket No. 25-5.)  The medical records provided as evidence show that Germosén's transfer to the ICU was ordered at 8:30 a.m.  Id.

While she was being treated at the ICU, Germosén lost consciousness and was intubated and mechanically ventilated. (Docket No. 1 ¶ 50.)  On or about 5:10 p.m., Germosén and her daughters received a visit from Doctor Wilson Ortiz Cotty ("Dr. Ortiz Cotty") who informed them that the following morning he would perform an endoscopy on Germosén to find the source of the bleeding.  Id. ¶ 52.  Fremia and Maysa claim that while their mother was under the care of the doctors at the ICU she looked desperate and uncomfortable.  Id. ¶ 52.  Her daughters noticed that the monitor was not reflecting information and asked one of the nurses about the problem.  Id. ¶ 54.  The nurse responded that the monitor was not working.  Id.  Said monitor was never replaced.  Id.

At 6:30 a.m. the following day, Fremia and Maysa received a call from one of the ICU nurses asking them to come to the ICU.  Id. ¶ 55.  Upon their arrival, Fremia and Maysa were informed that their mother had passed away.  Id.  Germosén passed away at 5:45 a.m. of March 19, 2013.  Id.

On March 14, 2014, Plaintiffs filed suit against Doctor's Center, Dr. De León, Dr. Piñero, Dr. González, Dr. Ortiz and other unnamed defendants, alleging that Defendants are liable for the wrongful death of their mother and seeking compensation for the damages suffered by the

Civil No. 14-1217 (GAG)

deceased and their own pain and suffering under EMTALA. (Docket No. 1.)  Moreover, Plaintiffs claim damages under Article 1802 by invoking the court's diversity jurisdiction pursuant to 28 U.S.C. § 1332.  Id.

## III.   Discussion

### A.  EMTALA Violations

Doctor's Center primarily argues that Plaintiffs do not have a valid EMTALA claim because Germosén was never transferred from Doctor's Center to another institution, but was instead admitted to Doctor's Center as an inpatient.  (Docket No. 25.)  As a result, Doctor's Center posits that the EMTALA provisions were never triggered.  Conversely, Plaintiffs contend that Germosén was not admitted as an inpatient at the time Defendants contend, but hours after Defendants suggest.  (Docket No. 31.)  Moreover, Plaintiffs posit that while treating Germosén at the emergency room, Defendants violated EMTALA's provisions.  Id.  According to Plaintiffs, the emergency room staff at Doctor's Center violated EMTALA's provisions before admitting Germosén to the hospital as an inpatient.  Id.

EMTALA has two essential provisions. The first requires that a participating hospital afford an appropriate medical screening to all persons who come to its emergency room seeking medical assistance. See 42 U.S.C. § 1395dd(a). The second requires that if an emergency medical condition exists, the participating hospital must render the services that are necessary to stabilize the patient's condition, unless transferring the patient to another facility is medically indicated and can be accomplished with relative safety.  See 42 U.S.C. §§ 1395dd (b)(1)(A), (b)(1)(B); Ortega v. Hospital San Pablo Bayamón, No. 10-1080 (GAG), 2012 WL 3583533 at* 2 (D.P.R. 2012).  A plaintiff may allege a violation under either provision, or both.  Benítez Rodríguez v. Hospital Pavía Hato Rey, 588 F. Supp. 2d 210, 214 (D.P.R. 2008).  Here, Plaintiffs

Civil No. 14-1217 (GAG)

contend that Doctor's Center incurred in violations of both provisions by failing to adequately screen Germosén and failing to stabilize her emergency medical condition before transferring her.  (Docket No. 1 ¶ 59.)  Upon examination of the pertinent law and facts of this case, the court holds that pursuant to EMTALA, Germosén was never transferred; therefore, the hospital was not bound by EMTALA's stabilization requirement.  The court sets forth the following reasons for this conclusion.

EMTALA was enacted in 1986 in response to reports of hospital emergency rooms refusing to treat indigent, uninsured patients without first assessing and/or stabilizing the patient's condition. This practice is colloquially known as "patient dumping."  Benítez Rodríguez, 588 F.Supp.2d at 213.  To deter said practice, EMTALA imposed some limited requirements on emergency rooms of hospitals participating in the federal Medicare program. Failure to comply with EMTALA requirements results in monetary fines.  See Rodríguez v. American Intern. Ins. of Puerto Rico, 402 F.3d 45, 47 (1st Cir. 2005); Correa v. Hosp. San Francisco, 69 F.3d 1184, 1189-1190 (1st Cir. 1995); Benítez Rodríguez, 588 F.Supp.2d at 213. On multiple occasions, the First Circuit has stated that "EMTALA does not create a cause of action for medical malpractice," Correa, 69 F.3d at 1192, but rather, "[it's] a limited 'anti-dumping' statute, not a federal malpractice statute.  It is designed to complement and not incorporate state malpractice law." Reynolds v. Maine Gen. Health, 218 F.3d 78, 83-84 (1st Cir. 2000) (internal citations omitted).  Instead, it "create[s] a remedy for patients in certain contexts in which a claim under state medical malpractice law was not available." Reynolds, 218 F.3d 78, 83.  EMTALA complements but in no way displaces or substitutes traditional state-law tort remedies for medical malpractice.

To assert a cause of action under EMTALA, a plaintiff must show the following.

Civil No. 14-1217 (GAG)

 (1) the hospital is a participating hospital, covered by EMTALA, that operates an emergency department (or an equivalent treatment facility); (2) the patient arrived at the facility seeking treatment; and (3) the hospital either (a) did not afford the patient an appropriate screening in order to determine if she had an emergency medical condition, or (b) bade farewell to the patient (whether by turning her away, discharging her, or improvidently transferring her) without first stabilizing the emergency medical condition.

Correa, 69 F.3d at 1190.

### 1. The screening requirement

The statute requires that every "participating hospital afford an appropriate medical screening to all persons who come to its emergency room seeking medical assistance." See Correa, 69 F.3d at 1189; 42 U.S.C. § 1395dd(a)-(c). In other words, every patient must be afforded the same type of screening procedure, in compliance with hospital protocol. See Cruz Vázquez v. Mennonite General Hosp., 717 F.3d 63, 69 (1st Cir. 2013). "The essence of this requirement is that there be some screening procedure, and that it be administered even-handedly." Correa, 69 F.3d at 1192.

"A hospital fulfills its statutory duty to screen patients in its emergency room if it provides for a screening examination reasonably calculated to identify critical medical conditions that may be afflicting symptomatic patients and provides that level of screening uniformly to all those who present substantially similar complaints." Id. As previously stated, EMTALA is not a cause of action for medical malpractice. "[F]aulty screening . . . as opposed to disparate screening or refusing to screen at all, does not contravene the statute." Id. at 1192-93 (internal citations omitted).

In this case, Plaintiffs tackle the adequacy of Germosén's emergency room screening, (Docket No. 1 ¶ 59) which is not encompassed by EMTALA's screening requirement. By

8

**Civil No. 14-1217 (GAG)**

questioning the standard of care afforded, Plaintiffs try to disguise a medical malpractice claim with an EMTALA violation.  Thus, Plaintiffs "faulty screening" claim is not actionable under EMTALA.

2.  <u>The stabilization requirement</u>

The statute's second provision guarantees that "if an emergency medical condition exists, the participating hospital must render the services that are necessary to stabilize the patient's condition . . . unless transferring the patient to another facility is medically indicated and can be accomplished with relative safety."  <u>Correa</u>, 69 F.3d at 1189; 42 U.S.C. § 1395dd(a)-(c). EMTALA defines "to stabilize" as "to provide such medical treatment of the condition as may be necessary to assure, within reasonable medical probability that no material deterioration of the condition is likely to result from or occur *during the transfer of the individual from a facility*." 42 U.S.C. § 1395dd(e)(3)(A) (emphasis provided).

The First Circuit has established that EMTALA's stabilization requirement "does not impose a standard of care prescribing how physicians must treat a critical patient's condition while he remains in the hospital, but merely prescribes a precondition the hospital must satisfy before it may undertake to transfer the patient."  <u>Álvarez Torres v. Ryder</u>, 582 F.3d 47, 51-52 (1st Cir. 2009) (internal quotations omitted).  In other words, the "stabilization" directive applies only where a transfer occurs, "[o]therwise, no effect is given to the phrase *during the transfer*." <u>Álvarez Torres</u>, 582 F.3d at 52 (citing <u>Harry v. Marchant</u>, 291 F.3d 767, 770–72 (11th Cir. 2002) (en banc) (emphasis provided).  Moreover, "transfer" is defined as "the movement (including the discharge) of an individual outside a hospital's facilities at the direction of any person employed by (or affiliated or associated, directly or indirectly, with) the hospital."  42 U.S.C. § 1395dd(e)(4).

Civil No. 14-1217 (GAG)

1    Thus, a hospital cannot violate EMTALA's duty to stabilize unless it actually transfers a

2    patient.  Álvarez Torres, 582 F.3d at 52.  To establish a violation to the stabilization requirement,

3    a plaintiff must prove that the hospital "bade farewell" to the patient.  Correa, 69 F.3d at 1190.

4    In light of mixed interpretations of the statute's "transfer" provision, the Code of Federal

5    Regulations clarified the provision and implemented a straightforward "inpatient" exception as

6    follows:

7        If an emergency medical condition is determined to exist, provide
         any necessary stabilizing treatment, as defined in paragraph (d) of
8        this section, or an appropriate transfer as defined in paragraph (e)
         of this section.  **If the hospital admits the individual as an**
9        **inpatient for further treatment, the hospital's obligation under**
         **this section ends, as specified in paragraph (d)(2) of this**
10       **section**.

11       …

12       (i) If a hospital has screened an individual under paragraph (a) of
         this section and found the individual to have an emergency medical
13       condition, and admits that individual as an inpatient in good faith
         in order to stabilize the emergency medical condition, the hospital
14       has satisfied its special responsibilities under this section with
         respect to that individual.

15

16   42 C.F.R. 489.24 (a)(i) & (a)(ii) (emphasis provided).

17       The parties spill ink going back and forth debating over Germosén's time of admission.

18   Doctor's Center argues that the record evidence demonstrates that Germosén was admitted to the

19   hospital as an inpatient by Dr. De León at 7:50 a.m. and transferred to the hospital's ICU at 8:50

20   a.m. (Docket Nos. 25-4; 25-5).  Plaintiffs contend that Germosén remained in the emergency

21   room until her emergency medical condition deteriorated and became critical, and was ultimately

22   transferred to the ICU at 12:55 p.m.  (Docket Nos. 1 ¶ 47; 32 ¶ 11.)  The parties' disagreement is

23

24

Civil No. 14-1217 (GAG)

futile.  The patient's admission to the hospital is essential to this court's decision –the time of admission is not.

Drawing all inferences in Plaintiffs' favor, Plaintiffs fail to demonstrate that Doctor's Center effectively bade Germosén farewell.  The record shows that Germosén never left Doctor's Center's facilities, i.e., she was never transferred, because she was admitted as an inpatient. Plaintiffs allege that Doctor's Center violated EMTALA's provisions by failing to stabilize Germosén before transferring her.  This allegation is erroneous because Germosén was never transferred; therefore, the stabilization precondition was never triggered.  By admitting Germosén as an inpatient, the hospital had no duty to stabilize under EMTALA.  Álvarez Torres, 582 F.3d at 51-52.  Because no transfer occurred, Plaintiffs have not established an adequate EMTALA stabilization claim.  Any other interpretation would undermine the purpose of EMTALA.

Plaintiffs' failure to claim actionable screening and stabilization claims under EMTALA leaves the court without subject matter jurisdiction over said claims; therefore, dismissal is warranted.  Accordingly, the court **GRANTS** Doctor's Center partial motion for summary judgment of Plaintiffs' EMTALA claims at Docket No.  25.

### B.  State Law Claims

Plaintiffs set forth a medical malpractice action, pursuant to the court's diversity jurisdiction and Article 1802 of the Puerto Rico Civil Code, for Defendants' alleged negligence while treating Germosén.  (Docket No. 1 ¶ 4.)  Upon examination of the Plaintiffs domicile, the court finds that Plaintiffs are not completely diverse; therefore, the court lacks subject matter jurisdiction.

Civil No. 14-1217 (GAG)

The requisites for diversity jurisdiction are set forth in 28 U.S.C.A. § 1332(a).  "Diversity jurisdiction exists only when there is complete diversity, that is, when no plaintiff is a citizen of the same state as any defendant."  Díaz-Rodríguez v. Pep Boys Corp., 410 F.3d 56, 58 (1st Cir. 2005) (quoting Gabriel v. Preble, 396 F.3d 10, 13 (1st Cir. 2005)).  Citizenship is determined by domicile.  García Pérez v. Santaella, 364 F.3d 348, 350 (1st Cir. 2004).  The party that invokes the court's diversity jurisdiction bears the burden of proof.  "Since federal courts are courts of limited jurisdiction, there is a presumption against our jurisdiction, and the party invoking federal jurisdiction bears the burden of proof."  Crowley v. Glaze, 710 F.2d 676, 678 (10th Cir. 1983).    Diversity is determined at the time the complaint is filed.  See Valentín v. Hosp. Bella Vista, 254 F.3d 358, 361 (1st Cir. 2001) (citing Bank One v. Montle, 964 F.2d 48, 49 (1st Cir. 1992)).  To properly invoke the court's diversity jurisdiction pursuant to 28 U.S.C. § 1332, the parties must be completely diverse and the action is for more than $75,000.  See Picciotto v. Cont'l Cas. Co., 512 F.3d 9, 17 (1st Cir. 2008).    Failure to demonstrate complete diversity between the parties results in dismissal.  Furthermore, a dismissal for lack of subject matter jurisdiction is not a dismissal on the merits and has no res judicata effect.  Thus, Plaintiffs are free to file their state law claims in State Court.  See Northeast Erectorrs Ass'n v. Secretary of Labor, OSHA, 62 F.3d 37, 39 (1st Cir. 1995).

Plaintiff Ceballos is a Resident of the Dominican Republic. (Docket No. 1 ¶ 7.)   His sisters, Fremia and Maysa, are residents of Bayamón, Puerto Rico.  Id.   Fremia, Maysa Defendants are all citizens of Puerto Rico.  (Docket No. 1 ¶¶ 8-12.)  As such, the parties fail to meet the complete diversity requirement.  Consequently, this court lacks subject matter jurisdiction to address Plaintiffs' state law claims.

Civil No. 14-1217 (GAG)

In light of the above this court **DISMISSES without prejudice** Plaintiffs' state law claims for lack of subject matter jurisdiction.  The Plaintiffs may very well have a solid medical malpractice claim under Article 1802 of the Puerto Rico Civil Code.  However, the same must be presented before a Court of the Commonwealth and no this federal court.

**IV.      Conclusion**

For the foregoing reasons the court **GRANTS** Doctor's Center's Partial Summary Judgment at Docket No. 25 and **DISMISSES without prejudice** Plaintiffs' state law claims for lack of subject matter jurisdiction.

S**O ORDERED.**

In San Juan, Puerto Rico this 2nd day of December, 2014.

*s/ Gustavo A. Gelpí*

GUSTAVO A. GELPI

United States District Judge

13